[Crim. No. 5906.   Second Dist., Div. Three.   Jan. 29, 1958.]

THE PEOPLE, Respondent, v. JACOB R. STEIN,
Appellant.

B. W. Kemper for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was charged in four counts with grand theft and in one count with issuing a check without sufficient funds.  In an nonjury trial he was acquitted of the grand theft charges and was convicted of the charge of issuing a check without sufficient funds.  Proceedings were suspended and probation was granted.  Defendant appeals from "the judgment of conviction" and the order granting probation.  (An order granting probation is deemed a final judgment.  Pen. Code, § 1237.)

Appellant contends (1) that the acquittal on the grand theft charges "is fatal to the judgment on the bad check

charge'' under the doctrine of collateral estoppel by judgment, and by the judgment of acquittal it was determined that there was no intent to defraud in the alleged grand theft transaction which also involved the check; and (2) that the evidence was insufficient to support the judgment of conviction.

Defendant allegedly was in the business of buying and selling scrap metal. Mr. Babbitt was the president of Century Industries, a corporation, which manufactured aluminum articles. He was also president of Fred's Trading Company, a corporation, which bought and sold surplus materials and scrap metal. Both companies transacted business at the same location. Century, in its process of manufacturing, accumulated scrap aluminum. Defendant and Mr. Babbitt became acquainted in the early part of March, 1956. At the time Mr. Babbitt said that his companies had some scrap metal that might be of interest to defendant. A few days later defendant inspected scrap aluminum at Century's factory and took samples of the aluminum for the purpose of ascertaining how much prospective purchasers would offer for it. There were contaminants on the aluminum, such as paint, paper, and plastic. Fred's Trading Company was the company that was interested in the matter of the sale. About March 20 the defendant returned and told Mr. Babbitt that the Apex Smelting Company offered prices ranging from 16½ cents to 21½ cents per pound, depending upon the various degrees of contamination. Mr. Babbitt testified that he and defendant discussed what the total amount would be for Fred's Trading Company; defendant said that he worked on three cents a pound and that his driver and truck would deliver the scrap to the foundry; Mr. Babbitt said that the only way he would work with defendant on the matter would be two cents a pound, that Mr. Babbitt's men would load the truck and handle the whole matter with defendant, and that it was a middleman transaction as far as defendant was concerned; defendant said that he would do that on the basis of two cents a. pound; Mr. Schary, the warehouse superintendent for the companies, was present at the conversation just referred to, and Mr. Babbitt told him to work directly with defendant with the scrap and to follow the whole transaction through; defendant said to Babbitt that since it was a transaction where defendant would get two cents a pound, he would have the Apex checks come to Babbitt, and defendant would not have any bookkeeping transaction other than the amount he received from Babbitt when the matter was settled.

The aluminum scrap, weighing 39,967 pounds, was delivered to Apex on March 27 and 28.

Mr. Babbitt testified further than on March 30 defendant told him, in the presence of Schary, that there was a question as to the grade, contaminants, and weights of the material that had been delivered to Apex and that all the material would be reinspected at Apex and adjustments would be made as to classification and weight so that the prices would truly reflect the condition, and therefore the check was not being made by Apex at that time and when it was all completed a check would be forthcoming; at that time defendant also said he wanted to continue to do business with Babbitt and he did not want him to feel bad because Apex was holding back the money, and that he wanted to give Babbitt his (defendant's) check for $5,000 on account of the money Apex was supposed to pay; Babbitt replied that defendant did not have to do that, and Apex was good for the money; defendant said he wanted to do that to create good will; Babbitt replied that if defendant wanted to give the check, that was fine; then defendant wrote the check for $5,000 (Exhibit 2—signed by defendant, dated March 30, 1956, payable to Fred's Trading Co., Inc., and drawn upon City National Bank of Beverly Hills); defendant stated further that when they finally straightened the classification matter with Apex, Babbitt would have the full sum and then Babbitt could take the check of Apex and repay the $5,000 plus two cents a pound and that the balance would remain with Fred's Trading Company.

The $5,000 check (which was made and delivered on Friday, March 30) was deposited in a bank on Monday, April 2. The check was not paid by the bank upon which it was drawn, and it was returned to Babbitt.

Babbitt testified that a few days thereafter (and before he knew the check had been returned by the bank) the defendant told him, in the presence of Schary, that he had received a $13,000 bad check and that some of the checks he had been writing might "bounce" and he hoped that the check he gave to Babbitt had gone through; defendant asked whether the check had bounced; Babbitt replied that he did not know but he would find out; after defendant had gone, Babbitt ascertained that the check had been returned; about April 9 Babbitt asked defendant what he had done to make the check good; defendant said he had been to Apex and the matter was being brought to a conclusion and the classification of

certain material had been changed and Apex was giving different prices which would increase the amount due; Babbitt did not know at that time that Apex had paid money to defendant for the scrap aluminum.

About March 26 Apex gave defendant a purchase order for the scrap aluminum on the basis that the price therefor would be "open" (between 16½ and 21½ cents a pound) and would depend upon the amount of contamination. At the time of giving the order Apex did not know that Babbitt or Fred's Trading Company was interested in the transaction. On March 27 after the first delivery to Apex, defendant asked Apex for an advance payment of $1,000 on the aluminum. Thereupon Apex paid that amount to defendant. On March 28, at defendant's request, Apex paid him $1,500 as another advance payment. On March 29, at his request, Apex paid him $2,000. It thus appears that when defendant gave his $5,000 check to Babbitt on March 30 and explained that Apex was delaying payment to Babbitt because Apex was reinspecting the aluminum, defendant had received $4,500 from Apex in part payment of the purchase price. On April 3 Apex paid defendant an additional amount of $2,227.33. Adjustments in the additional amounts of $87.81 and $27.72 were also paid to defendant. The total amount received by defendant from Apex was $6,842.86, and that amount was the total price of the aluminum.

On April 1 defendant delivered to Babbitt a check for $1,249.60, which check was drawn by Ben Kasle and was payable to Fred's Trading Company. The amount of that check was the difference between $5,000 and $6,249.60. The $6,249.60 was the amount which defendant and Schary computed to be the amount due to Fred's Trading Company (other than the $5,000) from the sale of the aluminum, after deducting from the total price of $6,842.86 an amount representing the number of pounds of aluminum at two cents a pound, and then adding approximately $190 for material sold by defendant to another company.

About April 18 Babbitt discovered that defendant had received money from Apex. Babbitt asked defendant what he was going to do about it. Defendant said he would have the matter cleared up the following Wednesday, that one of his best accounts had gone bad, and he had had a tight financial position. About three weeks later Babbitt asked defendant what he was going to do about the money. Defendant said he was going to New York and he would be back in a few days with the money. Later defendant said he would be in with

the money in a few days.   No part of the $5,000 has been paid.

Mr. Schary testified that about March 26 he was present at a conversation between Babbitt and defendant; at that time Babbitt told Schary that defendant would be working on a basis of two cents a pound; defendant said he was interested in seeing that the "poundage" was approximately correct, and that he was working on two cents a pound; on other occasions while the aluminum was being delivered, defendant told Schary the deal was a good one for defendant because he had no financial risk and he was working on a commission of two cents a pound; Schary was present when defendant gave the $5,000 check to Babbitt; at that time defendant told Babbitt he was sorry there was delay at Apex, and to show defendant's good faith he would give his $5,000 check to Babbitt and after the affair was settled they would adjust the difference; about three weeks after the aluminum had been delivered, Schary asked defendant about the $5,000 check that had been returned by the bank; defendant said he would take care of it as soon as possible; defendant said he had received all the money due from Apex on the sale of the aluminum; that was the first time Schary knew that defendant had received money from Apex. Schary testified further that on March 28, after the aluminum had been delivered, Schary asked defendant for a writing stating that defendant had received the material; then defendant wrote Exhibit 14 and gave it to Schary.   (That exhibit is a billhead of defendant.   Near the top of it there are the printed words, "Bought from."   After those words defendant wrote, "Fred's Trading Co."   At the bottom of the billhead, he wrote, "Approx 40000# various alum   J. R. Stein.")

Mr. Palmer, vice-president of Apex, testified that during the first week of April, at a luncheon where he, Babbitt, Schary and defendant were present, defendant said he was working on a commission basis on the aluminum.

There was not sufficient money in defendant's bank account, on any day from February 23, 1956, to June 5, 1956, to pay the $5,000 check.   That check was dishonored by the bank because insufficient funds were in defendant's account.   On April 4 when the $5,000 check was presented to the bank for payment the amount in defendant's account was $1,066.24. At the close of that day, after the posting of the bank books, the amount in that account was $3,293.57.   The bank had no arrangement with defendant for credit or payment of over-

drafts. On two or three occasions when a check of defendant was presented for payment and his funds were insufficient to pay it, the bank telephoned defendant and he made the check good.

Defendant testified, among other things, that he told Babbitt he would buy the aluminum from Babbitt and sell it at the best price possible on a margin of three cents a pound; Babbitt said he would sell it to defendant if defendant was willing to work on a two cents a pound profit; defendant said he was amenable to the two cents a pound profit and he would sell to Apex and that Babbitt could bill Apex if he desired to do so; Babbitt replied that he was selling it to defendant and when it was delivered Babbitt would bill defendant, and defendant could give him a check; Schary asked defendant for a memorandum purchase order, and defendant gave him Exhibit 14, and Schary did not object to the statement therein, "Bought from Fred's Trading Co."; in the conversation at the luncheon, defendant did say he was going to make two cents a pound profit, but he did not recall that he used the word, "commission"; when he gave the $5,000 check he told Babbitt that the check was not to be presented before April 4 because defendant expected other moneys and he had not collected in full from Apex; after the check was returned by the bank, defendant told Babbitt that a firm, from which defendant had received about $13,000 a month, had become bankrupt; that it was not defendant's intention not to pay Babbitt.

Appellant contends that the acquittal on the grand theft charges was in effect an acquittal of the charge of issuing a check without sufficient funds. His argument is to the effect that the issuing of the $5,000 check was a part of the alleged grand theft transaction and that the finding that grand theft was not committed was tantamount to finding that there was no fraudulent intent in issuing the $5,000 check. Grand theft and issuing a check without sufficient funds are separate offenses. (See *People* v. *Freedman,* 111 Cal.App.2d 611, 614 [245 P.2d 45].) The trial judge, in rendering his oral decision, stated the evidence shows that defendant was a commission broker and was to receive two cents a pound; that there was a plan and scheme; that defendant went back and got money on March 27, 28, and 29, and when he gave the check on March 30 he did not mention that he had gotten any money; that he was setting up a plan or scheme whereby he could ultimately wiggle out of this situation; that there was no question but that, when he gave the $5,000 check, he had

the intent to withhold the money from Mr. Babbitt. The judge also said he was giving the defendant a little more than the benefit of a doubt as to the grand theft charges. Under the evidence here it cannot be said that the acquittal on the grand theft charges was a determination that there was no fraudulent intent on the part of defendant in issuing the check.

The contention that the evidence was not sufficient to support the judgment of conviction, on the charge of issuing the check without sufficient funds, is not sustainable. Section 476a of the Penal Code provides: ''Any person who for himself . . . willfully, with intent to defraud, makes or draws or utters or delivers any check . . . upon any bank . . . for the payment of money, knowing at the time of such making, drawing, uttering or delivering that the maker or drawer . . . has not sufficient funds in, or credit with said bank . . . for the payment of such check . . . in full upon its presentation . . . is punishable . . . .'' During a period of several weeks before and after the making and delivery of the check, the defendant did not have sufficient funds in the bank for the payment of the check. No part of the check has been paid. The evidence was sufficient to prove fraudulent intent on the part of defendant in issuing the check.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.