[Crim. No. 3363.   First Dist., Div. One.   Oct. 27, 1958.]

THE PEOPLE, Respondent, v. BILLY C. KITCHENS et al., Appellants.

Michael Lewton and Hartly Fleischmann, under appointment by the District Court of Appeal, for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

BRAY, J.—Both defendants were convicted by a jury of 10 counts of felony—six counts of forgery, two counts of forging the seal of the State of California, one count of grand theft, and one count of conspiracy to commit the foregoing offenses. Sentence on count X was ordered to run consecutively to that on count I, sentences on all other counts to run concurrently with that on count I. Both defendants appeal from the judgments and presumably from the orders denying new trial.

## QUESTIONS PRESENTED

A. Both appeals.

1. Insufficiency of evidence. (Kitchens complains only as to counts V and VI.)

2. Lack of separate counsel.

3. Alleged misconduct of district attorney.

B. Kitchens' Appeal.

   1. Timeliness.

   2. Variance in proof as to count V.

C. Smith's Appeal.

Alleged errors in admission of evidence and lack of limiting instructions.

## FACTS

Count I dealt with a fictitious cashier's check of the American Trust Company for $200 cashed by Sears, Roebuck and Company. Count II dealt with a fictitious check of the same bank for $200 cashed by Mark Hopkins Hotel. Count III dealt with a fictitious check of the same bank for $350 cashed by the City of Paris. Count IV dealt with a fictitious check of the same bank for $100 cashed by Butler Bros. In each instance the person cashing the above checks endorsed on the particular check the number of the gasoline credit card and the driver's license shown by the person presenting the particular check. Each check was endorsed "Kenneth Ryan." A handwriting expert testified that those endorsements and the addresses written on the checks in counts I, III and IV, as well as the telephone number on the count IV check, were in the handwriting of defendant Kitchens. Count V dealt with a fictitious check of the same bank for $150 cashed by the Emporium. The store's sales manager testified that about 1 p. m. a man whom he could not identify except that he wore very dark glasses, a hat, and had a mustache "painted very dark" inquired of him the store's policy in cashing checks. About 6 p. m. the man returned and purchased a golf set and "bar-b-que razor." He presented a driver's license for identification, whose number the store's department manager wrote on the check. Count VI dealt with a fictitious cashier's check of First Western Bank and Trust Company for $200 cashed by Joseph Magnin store. Each of the checks in Counts V and VI were endorsed "Richard E. Chase." The expert had come to no conclusion whether or not this name was written by defendant Kitchens. Counts VII and VIII charged the counterfeiting of the seal of the State of California on the Chase driver's license and on that of one Colan, respectively. Count IX charged defendants with unlawfully taking $350 from the City of Paris. This refers to the amount lost by the store in cashing the fictitious check involved in

Count III.* There was evidence that in addition to the subject checks a number of similar fictitious checks had been presented to the two banks. An officer of First Western Bank testified that at least 10 checks ''in identical form and identical printing'' to the subject First Western Bank checks had been presented to the bank. Of the former two were introduced in evidence. An officer of the American Trust Company testified that other checks ''exactly similar in form'' to the subject American Trust Company checks were presented to the bank. Of the former six were introduced in evidence. The witness said there were two or three additional ones. The First Western Bank checks were demonstrated by the police to have been made by the paraphernalia found in Smith's possession. A reasonable inference from the evidence is that the American Trust Company checks were likewise so made. Count X charged conspiracy to commit the crimes set forth in the prior counts.

On February 9th a person registered at Mission Bell Motel, Daly City, as ''E. J. Murphy'' and his car as a Plymouth, license number AVY 974. At the trial the motel clerk identified defendant Smith as the ''Murphy'' who stayed at his motel. ''Murphy'' stayed at the motel about a week. The day he registered the police came to the motel, showed the clerk a picture of defendant Smith whom the witness identified as ''Murphy.'' The police then rented the room adjoining that given ''Murphy.'' LaBruzzo, a Daly City police officer, testified that the room was occupied by police in shifts. On February 14th defendant Smith arrived at the adjoining room. Noises of loading a car were heard. LaBruzzo had a warrant for Smith's arrest. As LaBruzzo and another officer approached him he was standing in the doorway of his room. Identifying themselves as police officers and stating that they had a warrant for his arrest for forgery, they told him that he was under arrest. Thereupon defendant Smith attempted

---

*Grand theft and issuing a check without sufficient funds (Pen. Code, § 476a) are separate offenses and a person may be convicted of both offenses, even where the check was used as the basis of the theft. (See *People* v. *Stein* (1958), 157 Cal.App.2d 259 [320 P.2d 519]; *People* v. *Freedman* (1952), 111 Cal.App.2d 611 [245 P.2d 45].) As pointed out in the latter case, the offense of issuing a check without sufficient funds is complete when the check is issued with intent to defraud even though no one is defrauded thereby. While the offense of grand theft involves the element of loss or detriment, the former offense may be committed without committing the latter. The same would be true of forgery of checks with intent to defraud (violation of Pen. Code, § 470), the crime charged in count III.

to push the officers outside the cabin. As they were handcuffing him he started to fight. After Smith was handcuffed LaBruzzo's companion stated that he was going to the motel office to phone the Daly City police department that the arrest had been made. When he left the cabin Smith complained that the handcuffs were too tight. As LaBruzzo approached to loosen them, Smith kicked LaBruzzo, knocking him to the floor, and then ran to the kitchen and dove through the window. When LaBruzzo got outside he saw Smith running down the street. LaBruzzo yelled to him to stop, and as Smith did not, LaBruzzo yelled that he would shoot if Smith did not stop. Smith failing to stop, LaBruzzo shot him in the leg. In Smith's pocket was a safe deposit key in one of the Bank of America branches which box was rented to "Edward J. Murphy." In the room occupied by defendant Smith the officers found a number of large cardboard and fibreboard boxes, and camera carrying cases. In them was a complete printing and photographic equipment comprised of cameras, developers, prints, films, press, type fonts and associated paraphernalia. There was also a box containing sheets of paper, which one of the police officers testified was similar to that of the fictitious checks. This paper was passed among the jurors together with the fictitious checks. In front of defendant Smith's room was a Plymouth bearing the same license number as that on the motel register. In the trunk there was a box of printing plates and a box of mixed type. They consisted of two "chases" or frames. In them was standing type. One slug of type found in the room spelled out the words "cashier's checks." Another contained the words "Richard Chase." The standing type in the frames when imprinted on the paper found in the room corresponded in part to the fictitious First Western Bank cashier's checks in question. By adding the loose type which appeared to have been used before (some apparently had not) to that in the frames, the officers were able to completely duplicate the subject First Western checks. In the room was found red and black ink. The fictitious checks bore both colors. There was also a paymaster check protector and a set of golf clubs. These latter were identified by the Emporium salesman as those he sold to the person who gave him the fictitious check involved in count V. An English-Spanish dictionary found in the room contained "Billy C. Kitchens, A-17422. Property of Billy C. Kitchens" on the inside of the first cover. There was also a memorandum book which appeared to be a diary. Under date of November

25th it stated ''Billy owes me 90 cents. I owe Billy.'' Under date of November 26th, ''Beer. Billy's also, 65 cents.'' Under date of November 23rd, ''11:00 o'clock, leave, L.V. T.J.'' (Tiajuana?) ''1:00 o'clock arrive L.A. 1:15 by machine. 1:45 leave L.A. 12:00 o'clock arrive San Francisco, put machine in black car. 12:30, have 'B' go on.'' (Smith denied this book to be his or in his handwriting or that the ''Billy'' and ''B'' referred to Kitchens.) A bank book in the name of E. J. Murphy was in the room, and a piece of paper addressed to whom it may concern purporting to be written and signed by Murphy but written by defendant Smith stating that Smith had Murphy's permission to operate his Plymouth, giving year, engine and license number. An examination of the safe deposit box to which the key taken from defendant Smith fitted disclosed what purported to be 15 blank cashier's checks of First Western Bank identical with that cashed as hereinbefore set forth. In the box also were negatives or originals of three driver's licenses, each in the name of Richard E. Chase, and three each in the name of Richard E. Colan. Additionally there were a brochure advertising kinds of type, a sample payroll check of the Harris Photo Studio, colored paper similar to that used in making checks, a paper entitled ''Banco Stock Form Business Checks'' with information concerning printing business checks. The number on the Chase license corresponded with the driver's license number on the checks passed at the Emporium and at Joseph Magnin's.

In defendant Kitchens' wallet at the time of his arrest was his driver's license. The fingerprints on it were identical with those on the ''Richard E. Colan'' and ''Richard E. Chase'' licenses. Likewise the expiration dates and physical description of the licensee were identical. The handwriting expert testified that the fingerprints on all the licenses were identical and were copied from defendant Kitchens' license. Investigation showed that there had been a Richard E. Colan at the address shown on the license but that he was dead. Also Tidewater Oil Company had never issued credit cards bearing the numbers used in this case. Richard E. Chase testified that while he had once lived at the address given on the license bearing his name, the signature was not his, nor was it his license. Moreover, the endorsements on the checks given the Emporium and Joseph Magnin's were not signed by him nor had he had anything to do with either transaction.

Richard E. Colan's brother testified that the former was

dead, that the signature on the driver's license bearing his name was not Richard's nor was the physical description on it that of his brother. The handwriting expert testified that the reproduction of a driver's license can be made through a photographic process. The Chase driver's license bore the same number as was endorsed on the checks cashed by the Emporium and Joseph Magnin's.

Evidence was introduced showing that in 1954 Smith made a photographic negative in the likeness of a genuine $20 federal reserve note and a genuine $5.00 United States note and pleaded guilty to the charge of counterfeiting.

Defendant Smith admitted registering at the motel under the name of Murphy. He testified that on February 7th or 8th he met at a bar an "Edward Murphy" and that he received the equipment and the golf set found in his room at the motel from him. Smith moved it to the motel. He denied ever using it, ever printing any checks or passing any fictitious checks. The key to the safe deposit box he found among the equipment. He denied renting such a box. He claimed that when arrested he was loading the Plymouth which he had purchased from Murphy and that the officers were belligerent and abusive. He claimed that LaBruzzo kept pushing him down in a chair and when he kicked at the officer he sort of catapulted himself out the window and doesn't remember what happened after that until he was in the ambulance. He knew Kitchens only as a casual acquaintance and had had no business dealings with him. Defendant Smith first testified that he bought the Plymouth from Murphy on February 8th for $250 cash. Later he said he bought it in January. He said that Murphy said he would sell Smith the equipment, worth about $2,500, at a "very, very low" price. Murphy brought it to Smith's home and said he would contact Smith the next day. On that day Smith told Murphy that Mrs. Smith did not want the equipment in the house. Murphy gave Smith the address of the Mission Bell Motel and told him to go there and to register in Murphy's name. This Smith did. A shipping tag on one of the boxes was addressed to "Dr. J. K. Ramsey, 438 Holloway, Maywood Street. Will Call." The address was Smith's home. The tag's date was January 20, 1956. When it was pointed out that he claimed not to have seen the equipment until February and that this tag was dated in January, Smith stated that he would make no attempt to explain. An agent of the telephone company testified that a certain unlisted telephone number was listed for a Dr. Z. H.

Ramsey at 438 Holloway, Smith's home. Smith said he would make no attempt to explain the note purporting to be signed by Murphy authorizing him to use Murphy's car and dated November 1, 1955, when Smith claimed he never met Murphy until January or February, 1956.

Among the material found in Smith's motel room was a Number 2 Moto Tool. A salesman in an industrial supply house testified that defendant Smith was a customer whom he knew as "Earl Smith." He was unable to state whether Smith was the man who on January 13th purchased the moto tool which he identified as the one found in Smith's room, the sales tag for which was made out to "Earl Smith." Smith denied knowing that the tool was in his room or anything about it. The sales tag was found by the officers in a box with tools at Smith's motel room.

Among Smith's effects at the hospital was a check book on the Daly City branch of the Bank of America. According to it the opening deposit was made in the name of "E. J. Lux." Five check stubs had been filled in. The third one was for $16 dated February 11th "for motel." Smith claimed to have paid his motel bill in cash. After his arrest Smith's wife presented to the police an authorization to release the Plymouth to her, written and signed by Smith and stating "E. J. Murphy gives authorization to Betty Smith to pick up my Plymouth." An employee of Bekins Van and Storage Company identified Smith as a person who rented a private storage room December 16, 1955. Smith and another man placed in it boxes about the same size as those taken from the motel room. The "Mailing or notifying address" given was "R. A. Smith, 3890 Mission, in care of E. J. Murphy." The operator of a telephone answering service testified that Smith was a subscriber to her service. In her records he was designated as "R. E. Smith," "R. V. Smith," "R. Z. Smith," and "Dr. R. Z. Smith," all this under "Smith & Smith Enterprises." Her records show that a B. A. Coleman would pick up mail in connection with Smith and Smith Enterprises and that he came to her office. Smith denied using the name "Coleman."

Defendant Kitchens denied any connection with the crimes or any circumstances connected therewith. He claimed that he and Smith were "more or less business acquaintances." He had sold Smith some goods. There was "more or less a platonic relationship." Then he testified that because Smith had a car in November, 1955, he took Smith with him to sell watches, among other places to Los Angeles and San Diego.

Smith and he were "keeping company" from the latter part of October until the middle or latter part of January or February. Theirs was also a social relationship as Kitchens was at Smith's house a number of times, had beer and probably a meal or two there. When shown an item in the memo book found in Smith's room (and which the expert said was in Smith's handwriting, although denied by him) "Billy owes me 90 cents" Kitchens stated that he probably did. As to the item "Saturday, November 26th, beer, Billy's also, 65 cents" Kitchens stated that Smith had bought beer for him. When asked if Smith ever owed him money he said, referring to the book, "He says there that he did. I don't recall at the moment that he ever did owe me any money." Referring to the item "leave T. J. . . . 1:00 o'clock, arrive L.A." while denying that they were together in Tiajuana he stated that he probably was with Smith in Los Angeles at that time. He could not recall if they stayed together in the same hotel there but they probably did. Referring to the item "1:15 buy machine" he stated that no machine was bought unless it was a "mixing machine" that they sold or a "deep fryer." Kitchens' explanation of the item "Put machine in black car" and "Have 'B' go on" was that it "looks like the writing of a nut, to me." Kitchens admitted that the English-Spanish dictionary found in Smith's room belonged to him, he speaks Spanish and refers to the book frequently. He could not account for its being in Smith's room.

At the time defendant Kitchens was arrested he was driving an automobile which he said he was buying. The purchase agreement was signed "Marshall W. Stevens" admittedly in Kitchens' handwriting. A savings account signature card of "Marshall W. Stevens" at the same branch of the Bank of America where the Murphy safe deposit and bank account were, was in the same handwriting, according to the expert, as was the signature to the purchase agreement. (Kitchens although admitting that the Stevens signature on the agreement was written by him, denied any connection with the savings account or signature card.) When Kitchens purchased the car he gave as a "Bank reference" "E. J. Murphy." Although he claimed that this was a different Murphy than the E. J. Murphy name used by Smith, Kitchens could not tell where his Murphy lived, his phone number or anything that would help in locating him. Smith's automobile which he claimed to have purchased from Murphy originally stood in the name of Coleman, the same name that was using Smith's

phone number and answering service. Apparently Coleman was another alias of Smith's. Of some significance on the question of Smith being Murphy is the note which Smith after his arrest gave his wife: "*E. J. Murphy gives* authorization to Betty Smith to pick up my Plymouth" signed "R. E. Smith." (Emphasis added.) When Kitchens purchased his automobile under the name "Marshall W. Stevens" he gave as "Bank reference, E. J. Murphy." Likewise when he opened a bank account at the Day and Night branch of the Bank of America where Smith under the name of E. J. Murphy had opened an account the month before, Kitchens also gave E. J. Murphy as reference. He claimed that this Murphy was not the Smith's alias Murphy.

A. BOTH APPEALS.

(1) *Insufficiency of Evidence.*

█ The evidence clearly shows that the two defendants were engaged in a conspiracy to obtain money by fictitious cashier's checks, Smith to make them and Kitchens to pass them. There can be no question but that the only E. J. Murphy was Smith assuming that name. The paraphernalia found in Smith's possession was demonstrated to be that used in the making of the fictitious checks in question here. The finding of this paraphernalia in Smith's possession, his many falsehoods concerning it, plus the fact that Smith's ability to use it, if not inferred from the other circumstances in the case, is shown by the fact that he had pleaded guilty to making photographic negatives of the United States bills, plus Smith's attempted flight, fully support the jury's findings that he was guilty of conspiracy and the other crimes. Kitchens' connection with the conspiracy and the crimes is likewise well shown. His handwriting on the endorsements of some of the checks showing that he was the one who passed them, the use of his driver's license to make the other licenses used for identification purposes, his close association and trips with Smith, his using Smith's alias of Murphy as references, his property being included in the property found in Smith's room, and the other circumstances of the case tie Kitchens completely into the conspiracy and crimes.

█ Kitchens' opening brief concedes that except as to counts V and VI the evidence is sufficient for he says: "Insufficiency of the evidence is raised as a ground for appeal in only two of the ten counts." As to these counts, dealing with the checks cashed at the Emporium and Magnin's respectively,

he contends that because it was not shown who presented the checks there and the endorsements were not shown to be in his handwriting the evidence was insufficient to convict him on these counts. However, the checks were shown to be identical with those made by the paraphernalia in Smith's possession. Whoever cashed these checks showed the clerks the Richard E. Chase driver's license because its number was endorsed on the checks, and, of course, this license was photographed with some changes, from Kitchens' license. The golf clubs purchased from the Emporium by the fictitious check were among Smith's possessions. Whether Kitchens passed the checks or not is unimportant. The evidence clearly shows that at the very least, he aided and abetted in their passing and hence is guilty as a principal.

Among Smith's contentions that the evidence is insufficient are that there was no evidence to show that he had the "personal physical and artistic abilities required to make the checks" and he was not shown to have any connection with the subject checks. Those contentions are unsound. First, if he was able to counterfeit United States bills he must have had some ability along those lines. Secondly, and more important, the paraphernalia he had was demonstrated to be that used in the counterfeiting of the checks and the state seals. His lies as to his possession of them, coupled with the fact that at least one of the fruits of their being uttered, the golf clubs, were in his possession plus the other circumstances of the case, raises the undisputable inference that he knew how and did make the checks. While it is true that defendant testified he lacked any knowledge of printing, the facts (among others, the collection of literature on printing found in his room) belie his words. His connection with the Emporium check by the golf clubs, the 15 blank fictitious First Western checks found in his safe deposit box, and the fact that the officers with the equipment found in his room were able to duplicate them, leaves no room for a finding of innocence. Smith contends that in spite of the expert testimony that the photographic equipment found in Smith's room could be and probably was used to photograph the driver's license containing the state seal, the fact that the expert himself stated that he would not have used certain lenses for that purpose, causes a failure of proof on the charges of counterfeiting the state seal. That contention answers itself. Moreover, the lenses referred to were not those found in Smith's room but in Kitchens' car.

■ Smith's contention that the conspiracy charge is not shown is based upon the claim that no express agreement between the two defendants was shown. The law does not require that a criminal conspiracy agreement be a formal one or even that it be in writing, or that the persons hold a meeting or expressly state the terms of a common understanding. The agreement may come into being through a tacit mutual understanding. ■ The wilful, intentional and knowing adoption by two or more persons of a conspiracy, if the elements of a conspiracy are present, to wit, an agreement to combine together to commit an unlawful act, and in furtherance thereof an overt act committed by one or more of the parties to the agreement makes a conspiracy. It is clear that all of these requirements were proved.

(2) *Separate Counsel.*

■ From the time that both defendants were arraigned they were represented by an attorney of their own choosing. As Defendant Kitchens says in his opening brief, "neither the court nor the district attorney had anything to do with the creation of conflicting representation by counsel for the two defendants. Thus the case differs on its facts from *People* v. *Lanigan*, 22 Cal.2d 569 [140 P.2d 24, 148 A.L.R. 176], the leading California case on the subject." After the district attorney finished his opening argument to the jury defendant Kitchens sought permission to argue to the jury on his own behalf. The attorney then stated that if Kitchens was going to argue, the attorney wanted to withdraw as far as Kitchens was concerned. A discussion ensued in which Kitchens stated that he wanted to argue that Smith used Kitchens' driver's license to make "phoney drivers' licenses with" because he could not use his own, and Kitchens had not given him permission to use his. Smith then asked permission to talk and stated, in the absence of the jury, that he objected to Kitchens arguing because he, Smith, if he were the man who photographed the license, could have used his own license by merely deleting portions of it. The court then asked Kitchens if he desired to dismiss the attorney. Kitchens replied that he would "like to retain him to advise me in the case. I'm no attorney." Defendant Smith pointed out that he, Smith, had not discharged the attorney. After further discussion the court stated that the attorney would act for Kitchens in an advisory capacity. The court then called the jury in and informed them that Kitchens had discharged the

attorney and would argue his own case, and that the attorney would argue Smith's case, which he did. Both defendants now argue that at some phase of the trial the court should have recognized that there was to be a conflict of interests between the two defendants and have suggested to them that one or the other get another attorney. In 14 California Jurisprudence 2d, section 156, page 393, it is stated: "The trial court is under no duty to ascertain whether or not a conflict of interest might arise between codefendants for whom the same counsel has been *appointed*; any conflict should be brought to the court's attention by objection raised by defendants or counsel." (Emphasis added.) So much more is this true of an attorney selected by the parties themselves as here, rather than one appointed by the court. Moreover, not until final argument did either of the parties see any conflict in their interests, and even then, Kitchens did not ask for another attorney. He still wanted the same attorney to advise him, but wanted to argue the case himself. Smith objected to Kichens being allowed the separate representation he asked for. Under the circumstances here neither party has cause for complaint nor did the court err in its actions.

(3) *Alleged Misconduct.*

█ During the cross-examination of Kitchens about the identity of E. J. Murphy, who Kitchens claimed was the person who introduced him to the man from whom he purchased his car, Kitchens stated that there were three men in the courtroom who knew Murphy. As Kitchens named each one, the district attorney asked him to stand. He asked Kitchens if he had subpoenaed any of these men to testify for him. Kitchens replied that he had not. One of the men was a Mr. Abraham. Counsel asked Kitchens if at any time Kitchens and Abraham had lived together. Kitchens said they had. Later, counsel asked if at the time Kitchens was arrested Abraham was arrested with him. Kitchens said he was. No objection was made to any of the foregoing. Another of the men was a Mr. Bucalos. Kitchens was then asked if Bucalos was Edwin Benzenu Bucalos from Brooklyn or Arthur Thomas Bucalos. For the first time an objection was interposed. The district attorney said the question was probably irrelevant and the court sustained the objection. We see no misconduct here. Defendant Kitchens himself did not consider the matter sufficient to interpose objections except in the last instance, nor did he ask for an admonition.

In his closing argument the district attorney referred to the fact that Smith had admitted using the name of Murphy in renting the motel room, and then stated that Smith must have lied to his lawyer that he was not the one who rented the motel room, otherwise the latter would not have questioned the motel man in a manner to indicate that Smith was not the renter. No objection or assignment was made to this argument. Smith then refers to the fact that the district attorney was permitted over objection that it was a confidential communication to ask Smith if he had told his lawyer that Officer LaBruzzo had pistol whipped him at the motel. (Defense counsel in cross-examining LaBruzzo had asked him if he had not pistol whipped Smith.) Again pointing out that defense attorney had cross-examined the motel manager at some length as to whether Smith was Murphy, the district attorney then asked if Smith had told his lawyer that he was Murphy. This time when the objection was made that the matter was confidential the court indicated that it would sustain the objection. The district attorney then stated "there may be a confidential communication." The court should have sustained the first objection. The district attorney had no right to question defendant Smith concerning his communications to his own lawyer, nor did he have the right on argument to comment the way he did. However, under the circumstances of this case we do not believe the court's error to be prejudicial nor do we believe the district attorney's actions to be misconduct. While he should not have asked the questions nor made the argument, it appears to be one of those mistakes made in the heat of a contested trial, not amounting to prejudicial misconduct.

The district attorney argued that in spite of the testimony of the handwriting expert who he said would not give an opinion unless he was absolutely certain, the "Richard E. Chase" endorsements were made by Smith. He pointed out the similarity in Smith's writing to that of the endorsements and then suggested to the jury that they make the comparison. Again no objection was made to this argument nor any assignment made. At no time did the district attorney give his opinion. As he stated, he was not a handwriting expert. The argument was based on completely legitimate inferences that could be drawn from the evidence. There is not the slightest resemblance between this argument and those condemned in *People* v. *Kirkes* (1952), 39 Cal.2d 719 [249 P.2d 1]; *People* v. *Brophy* (1954), 122 Cal.App.2d 638 [265 P.2d

593], and *People* v. *Jones* (1955), 136 Cal.App.2d 175 [288 P.2d 544].

The same is true of the contention of defendant Kitchens that the district attorney was guilty of misconduct in stating in argument that ''Checks were floated all over the State,'' in Hopland, in Mendocino County, in Las Vegas and certain other places, and that they were manufactured by Smith. ''[A]ll over the state'' was an exaggeration, probably a permissible one, as there were a number of checks in evidence other than the subject checks, including ones at every place mentioned in the argument. There was testimony that these were identical with the subject checks.

In the memorandum found in the room which was testified to be in Smith's handwriting was a reference to ''leave T.J.'' A reasonable inference to be drawn under the circumstances is that it meant Tiajuana. In referring in argument to this memorandum the district attorney stated ''there's a memorandum, 'leave Tiajuana'—there's where many of those checks were cashed.'' The evidence showed that some of the fictitious checks were cashed there. This also was legitimate argument.

In referring to statements made by Smith in his argument, which the district attorney contended were based upon matters not in evidence, the district attorney said that both he and Kitchens' attorney were bound by rules and that ''the Judge would bat me down'' and he would be guilty of contempt of court if he should tell the jury something that was not in evidence. No objection was made and we see no misconduct.

In his argument Kitchens stated twice that he had been arrested for drunk a few times and that on his first felony arrest he went to San Quentin. In his closing argument the district attorney referred to these statements and then stated he wanted to show Kitchens his criminal record. He then asked Kitchens if he had not been arrested on six different occasions, for assault with a deadly weapon, robbery, grand theft, possession of narcotics, another charge of robbery, respectively, and returned to prison as a parole violator. Probably four of these arrests were prior to the one upon which he went to San Quentin. Kitchens said, ''I've been arrested a million times. I've pled guilty no time, I've been convicted one time.'' He then admitted that his first statement was incorrect, claiming he meant that he had only been convicted once.

Apparently Kitchens in his argument for some reason felt that it was important to impress upon the jury that the first time he was arrested (for anything other than drunk) he was convicted and sent to San Quentin, and that he was an ex-convict. (He said so a couple of times.) We deem it unnecessary to determine whether Kitchens thereby "opened the gates"* to justify the district attorney in asking him about the five other arrests and the effect of defendant's failure to object thereto, for the reason that, assuming the district attorney's action to have been improper, we do not find that under the circumstances of this case, such action was prejudicial misconduct.

## B. KITCHENS' APPEAL

### (1) Timeliness

Judgment was entered and Kitchens sentenced on February 7, 1957. Ten days for appeal are provided by Rule 31, Rules on Appeal. The 10th day (February 17th) fell on a Sunday; hence the time to appeal was automatically extended to Monday, February 18th. The notice of appeal was filed in the county clerk's office Tuesday, February 19th, one day late. However, from undenied affidavits the facts bring this case within the rule of *People* v. *Slobodion*, 30 Cal.2d 362 [181 P.2d 868]. The next day after judgment, February 8th, Kitchens was admitted to the Reception Guidance Center at San Quentin. Monday, February 11th, he filled out a mimeographed form requesting an interview with the center's legal advisor. Thursday, February 14th, the interview was had in which defendant advised the advisor that he desired to file an appeal. The latter instructed him to prepare a note to that effect. This he did the same day, and pursuant to the instructions of the advisor, delivered it to the latter's clerk for typing. When typed he signed it and delivered it to the clerk, being advised by both the advisor and the clerk that the matter would be taken care of. The Associate Warden at San Quentin examined the prison records and found that Kitchens' "Mail Card" maintained by the institution shows that on February 14, 1957, Kitchens sent correspondence to the "Clk Supr Crt, S. F." No other correspondence was sent by Kitchens to such clerk until after February 28th. As the clerk received the notice of appeal on February 19th it is clear that it is the notice mailed at San Quentin on February

*See *People* v. *McDaniel*, 59 Cal.App.2d 672 [140 P.2d 88], and 27 Cal.Jur. p. 74, for discussion of the "open the gates" theory.

14th. For some reason entirely beyond defendant's control it took from Thursday, February 14th, which was the seventh day after judgment, to Tuesday, February 19th, for the notice of appeal to go from San Quentin to the clerk's office in San Francisco, a total of five days. As defendant did all he could do because of his confinement within a reasonable time prior to the expiration of his time to appeal, and was not negligent, we are required to hold that constructively his notice of appeal was filed in time. (See *People* v. *Slobodion, supra,* 30 Cal.2d 362; *In re Gonsalves,* 48 Cal.2d 638 [311 P.2d 483]; *People* v. *Frye,* 117 Cal.App.2d 101 [255 P.2d 105].)

(2) *Variance.*

Count V charged the passing at the Emporium of a fictitious American Trust Company cashier's check, while the proof showed that it was a First Western Bank check. In all other respects the proof conformed to the charge. No objection was made on the ground of variance at any time to the introduction of evidence under this count, nor was the claim of variance raised at any time in the trial court. This was, in effect, a waiver of the variance. (See *People* v. *Holland,* 158 Cal.App.2d 583, 586 [322 P.2d 983]; *People* v. *Pryor,* 17 Cal.App.2d 147, 151 [61 P.2d 773].) Moreover, the error in the name of the drawee bank was not material. Defendants are fully protected against further charges based on the same offense. (See *People* v. *Leiva,* 134 Cal.App.2d 100, 103 [285 P.2d 46].)

## C. Smith's Appeal

*Alleged Errors in Evidence and Instructions.*

Defendant Smith contends that the admission of the book with Kitchens' name in it, which Kitchens later admitted was his book, was error. It was admissible to show association between the parties. Smith takes several of the matters introduced into evidence which if taken alone would not prove conspiracy, for example, that Kitchens, not Smith, wrote the endorsements on certain of the checks, and contends that each was not admissible. They were admissible as showing acts of the conspirators and in addition, when taken as a whole, proved the conspiracy.

Smith contends the court should have given an instruction to the effect that mere association did not prove a conspiracy. The court gave such an instruction. Smith contends that the

15 blank fictitious First Western Bank checks found in his safe deposit box were inadmissible. Witness Moody testified that these checks appeared to be identical to those cashed at the Emporium and Magnin's which later testimony showed to have been produced by Smith's equipment. There can be no question about their being admissible.

■ Because of their similarity to the subject checks and to those produced by means of the Smith equipment, the photostats of a fictitious First Western Bank check purporting to be endorsed by ''Richard E. Colan'' (the name on one set of driver's licenses found in Smith's safe deposit box) drawn on First Western Bank and six fictitious American Trust checks were properly admitted. They were evidence of the conspiracy and a part of the scheme or plan connected with the making and uttering of the subject checks. Smith claims the court should have given a limiting instruction to the effect that these checks were only admissible to show conspiracy. Assuming, but not deciding, that the checks were admissible only for such limited purpose, his failure to offer such an instruction precludes him from complaining now.

The judgments and orders are affirmed.

Peters, P. J., and St. Clair, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.